UNITED STATES FIDELITY AND GUARANTY COMPANY, UNITED STATES FIRE INSURANCE COMPANY, EFTHIMIOUS MARIA-KAKIS AND VIRGINIA MARIAKAKIS PLAINTIFFS v. TRAVEL-ON MOTORCYCLE COMPANY, INC. DEFENDANT

No. 7514SC786

(Filed 3 March 1976)

**Fires § 3; Negligence § 29— use of defective oxyacetylene torch — sufficiency of evidence of negligence**

Plaintiffs' evidence was sufficient for the jury to find that an employee of defendant's motorcycle shop, after removing the gas tank from a motorcycle and placing it on the noncombustible floor, was negligent in lighting an oxyacetylene torch which he knew or should have known was defective or improperly adjusted so that the torch popped and threw to the floor sparks and flame which ignited a flammable substance on the floor and caused the damage complained of.

APPEAL by defendant from *Canaday, Judge.* Judgment entered 12 June 1975 in Superior Court, DURHAM County. Heard in the Court of Appeals 22 January 1976.

This is a civil action wherein the plaintiffs, United States Fidelity and Guaranty Company, United States Fire Insurance Company, Efthimious Mariakakis and Virginia Mariakakis are seeking $19,059.80 damages from the defendant, Travel-On Motorcycle Company, Inc., as a result of the alleged negligence of one of defendant's employees in causing a fire which damaged property leased by the defendant from the Mariakakises and insured by the plaintiff insurance companies.

In their amended complaint, the plaintiffs alleged in pertinent part the following:

"That John Strickland, and, through him, the defendant, was negligent in that:

(a) John Strickland ignited and used a welding torch in a careless and reckless manner;

(b) ignited and used said torch in an area in which gas and gas fumes were present, and in a room with no ventilation, on a damp, rainy day; . . . . "

At the close of plaintiffs' evidence at trial the court allowed the defendant's motion for a directed verdict. Plaintiffs appealed.

*Spears, Spears, Barnes, Baker and Boles by J. Bruce Hoof for plaintiff appellants United States Fidelity and Guaranty Company and United States Fire Insurance Company.*

*Richard M. Taylor, Jr., for plaintiff appellants Efthimious and Virginia Mariakakis.*

*Mount, White, King, Hutson, Walker and Carden by W. H. Lambe, Jr., and R. Hayes Hofler III, for defendant appellee.*

HEDRICK, Judge.

This appeal presents the question of whether the court erred in allowing the defendant's motion for a directed verdict at the close of plaintiffs' evidence. At trial the plaintiffs offered evidence tending to show the following.

Pursuant to a lease agreement with Efthimious and Virginia Mariakakis entered on 11 December 1969, Travel-On Motorcycle Company occupied part of a building located near U. S. 15-501 at Eastgate Shopping Center in Chapel Hill, North Carolina. The leased portion of the building was used to sell and service motorcycles. Travel-On had conducted extensive renovations of the interior of the building, including covering the concrete floor of the service area which measured 25 feet by 25 feet with torginol, a non-combustible, resin-like, solid floor covering.

On 16 February 1970, approximately two weeks after Travel-On began using the service area, Charles Fry drove his motorcycle to the defendant's place of business to have defendant's mechanic, John Strickland, weld a piece of the frame which was in danger of falling off.

Charles Fry testified that his motorcycle was a 1968 Triumph. Because his motorcycle was old, when the gas tank was removed, the tubes through which the gas flowed from the engine to the carburetor would "flop down." He then testified as follows:

> "It is a hard thing for me to know or not know if there was gasoline in those tubes on this occasion. The only thing I would have to go by would be every time that I ever cut my motorcycle off, there would always be some gas in those tubes—because I didn't perform the operation myself this time, I wouldn't know. It is possible to take that tank off and have the tubes empty. What you would have

to do in that case would be to cut the gas off and let the motorcycle run and then since you would have the valve turned off, no more would flow down there, it would be empty. I cut the motorcycle off myself on this occasion. It wasn't started up again after I cut it off out front and pushed it around."

As Fry stood by watching, Strickland removed the gas tank, setting it on the floor of the service area, and prepared to spot weld the broken piece of the frame. With respect to what then occurred, Fry testified:

"After the motorcycle was in there, I was sort of loitering, I guess. I was leaning up against the workbench talking to Johnny as he was preparing to fix the motorcycle. First thing that he did was started the procedure to remove the tank which he had to do in order to get the piece that he had to fix. He had to stop the flow of gas from the tank to the carburetor, which although I can't testify that I saw him turn the—there is a lever that stops the flow of gas coming from the tank, flowing from the tank to the carburetor by gravity, flow-down tube. There is a lever that opens a valve, and he did turn the lever. The valve was off when he removed the tank because if it hadn't been gas would have been everywhere.

He removed the tank, set it down, I would say four to five feet from the motorcycle. All right, he then proceeded to take the blow torch, the oxyacetylene torch, off the rack, off the tank that it was hanging on, and he lit it. He was adjusting—there is a screw that adjusts the length of the flame, or the heat of the flame, whatever it does to the torch, and the flame was burning, I would say three to four inches, a blue flame; and the next instant the flame—one big—just shoot—just went shot out really big (indicating), and in a straight line to the floor, and just like it was the fire bounced off the floor. It came out of the torch, and just instantly, one second, it was small and the next it was real big, and frightened me, honestly; and almost in the same instant though the fire went off in the torch. I don't know how the fire went off, how the fire came off the torch, whether or not it was the valve was turned off, or it went malfunctioned and went off, or what; but it did go off. My attention transferred from the fire

coming out of the torch to there being a small patch of fire burning on the floor."

Strickland described the occurrence as follows:

"On February 16, 1970, at approximately 3:30 p.m., I was doing some welding in the repair shop. There were no other open flames in the room besides my welding torch; there was no other source of ignition in the repair room beside my welding torch. After I started welding, I had my shield on, which is goggles to protect my eyes, and there was a pop which came from holding my torch too close to the material which I was welding. Seconds thereafter, and I don't remember how long, someone yelled, 'Fire'; someone who owned the motorcycle was standing behind me and he hollered, 'Fire!' and I pulled my goggles off and I saw the flame and I switched the torch off." * * *

"Prior to the time that I started welding I had removed the gas tank off this motorcycle because the particular part which I was going to weld was located on the frame beneath the tank. No gasoline spilled out of the tank when I removed it. The particular motorcycle was a Triumph, it has shut-off valves and cross-over tubes, consequently you have a valve on each side of the tank, and they were shut off. You had to disconnect the lines. No gas that I know of leaked out of the tank. I didn't see any gas and I would say no. I don't know or don't recall any gasoline leaking out. I didn't check around the gas tank before I started welding to see if there was any gasoline on the floor or if any gas had leaked or spilled out of the tank, but it wasn't leaking when I set it down. The tank was removed probably ten to fifteen feet from the point where I was doing the welding. I had removed it probably five feet from the motorcycle. If you were to take a point where that motorcycle was located, where I took the tank off, and were to draw a line to the point where I put the gas tank down, the closest point along that line at the place where I was doing the welding would be about fifteen feet. I was welding a condenser bracket, the condensers for the ignition rods are mounted under the tank, and we didn't have one in stock, so I was repairing that one. This was not attached to the motorcycle at the time I was welding, the bracket is attached to the motorcycle but it had broken in the center so consequently I removed it from the motor-

cycle and put it on the bench to weld it. I was working on the top of a big iron press, it wasn't a bench, it was a press. I was welding with an oxyacetylene torch and the torch popped.

When a torch pops, I don't know chemically what happens, but when you get the flame too close to the molten metal something happens. The oxygen or acetylene, there is an explosion and sparks fly. It throws sparks all over. It is pretty common, when you have goggles on you never notice. You are aware of sparks, you just keep on going, you don't stop. It is nothing to be alarmed about. Consequently I heard a pop but I did not see the sparks. In a very short period of time after I heard the torch pop, say a couple of seconds to a minute, I heard someone shout 'Fire', I turned around and saw the fire to my immediate right, it was on the floor. A small area of the floor was burning. When the popping occurred I continued to weld until I heard the person shout 'Fire.' It was burning with a visible flame in a small area to my immediate right."

Charles Harmon, an expert witness for the plaintiff, testified that:

"Torginol is the floor covering I think you are referring to. It is a synthetic resin, a jointless floor covering material. I am familiar with combustion as it occurs when oxyacetylene welding is done. In oxyacetylene welding, a tank under high pressure of oxygen and acetylene is connected by means of passage ways and control valves to bring the two streams together under regulated conditions, and when these streams are brought together and regulated properly and ignited, one obtains a flame that has a very high temperature.

Popping is a noise which is caused by combustion instability in the operation of an oxyacetylene torch. Popping is caused by faulty equipment, improperly adjusted equipment, or improper operation of the equipment. Popping causes a large spray, can be expected to cause a large spray of sparks and it is an undesirable thing to have happen. One can examine a welding afterwards and tell a popping had occurred because it is detrimental to the weld.

Assuming that the jury finds the facts to be that on February 16, 1970, Mr. John Strickland removed a gas

Fidelity and Guaranty Co. v. Motorcycle Co.

tank containing gasoline from a motorcycle and placed that gas tank on the floor of the repair room in which he was working, that the floor was made of concrete with a torginol covering, that Mr. Strickland ignited an oxyacetylene welding torch and commenced to weld upon a motorcycle bracket, that there were no open flames or sources of sparks in the immediate area, and that there were no flammable liquids in the vicinity other than gasoline; that shortly thereafter he noticed a fire upon the floor of the room covering an area approximately three to four square feet burning with visible flames and appearing to come from the floor; that this fire was located approximately six feet from the point where the welding was taking place and was also located near the gas tank which had been removed; that in a matter of approximately ten seconds the fire spread towards and engulfed the gas tank; assuming the jury finds the above facts to be true, I have an opinion as to what caused this fire. That opinion is that the sparks caused from the oxyacetylene welding would in my view be the source of the fire. Assuming the jury finds the fact to be that the fire occurred in the manner described in the prior hypothetical question, I have an opinion as to whether such fire could have occurred if no flammable substance was on the floor of the repair room. That opinion is that there could be no fire coming from that floor if there were no flammable liquid on the floor. If there is nothing flammable on the floor, because the flooring material is noncombustible, it will not burn."

In our opinion the evidence offered at trial, when considered in the light most favorable to the plaintiff, will permit the jury to find that Strickland lighted an oxyacetylene torch which he knew or should have known was defective or improperly adjusted, and would pop and throw sparks and flame all over the vicinity where he was welding, and that the torch did pop and did throw sparks and flame to the floor which was made of a noncombustible material, and that the sparks and flame sprayed upon the floor ignited a flammable substance which Strickland knew or should have known was upon the floor within the vicinity of the point where he had lighted and was using the oxyacetylene torch, and that the fire so ignited spread and caused the damage complained of. Such findings in our opinion are sufficient to support a verdict by the jury that the defendant was negligent and that such negligence was

the proximate cause of the fire and resulting damage to plaintiffs.

Plaintiffs have brought forth and argued other assignments of error which we do not discuss since they are not likely to occur at a new trial. For the reasons stated the judgment appealed from is reversed.

Reversed.

Judges BRITT and MARTIN concur.